**MAGNA PICTURES CORPORATION, a corporation, and Magna Pictures Distribution Corporation, a corporation, Plaintiffs,**

v.

**PARAMOUNT PICTURES CORPORATION, a corporation, and Embassy Pictures Corporation, a corporation, Defendants.**

Civ. No. 66–796.

United States District Court
C. D. California.

Feb. 28, 1967.

Broad, Busterud & Khourie, Michael N. Khourie, San Francisco, Cal., for plaintiffs.

O'Melveny & Myers, Everett B. Clary, Richard E. Sherwood, Richard C. Warmer, Los Angeles, Cal., for defendants.

## MEMORANDUM AND ORDER

REAL, District Judge.

Plaintiffs MAGNA PICTURES CORPORATION, a corporation and MAGNA PICTURES DISTRIBUTION, a corporation move: (1) to strike the third defense from the answer of defendants PARAMOUNT PICTURES CORPORATION, a corporation, and EMBASSY PICTURES CORPORATION, a corporation pursuant to Rule 12(f) [1] of the Federal Rules of Civil Procedure, on the ground that such defenses are insufficient; (2) to dismiss the counterclaim alleged by each defendant pursuant to Rule 12(b) (1) [2] of the Federal Rules of Civil Procedure, on the ground the court lacks jurisdiction over the subject matter; (3) to order separate trial of the counterclaim alleged by each defendant pursuant to Rule 42(b) [3] of the Federal Rules of Civil Procedure, on the ground that failure to do so will cause grave inconvenience and prejudice; and (4) for an enlargement of time in which to move or plead to the counterclaim alleged by each defendant to and including thirty (30) days after determination by the court of the motions (1) and (2) pursuant to Rule 6(b) [4] of the Federal Rules of Civil Procedure.

1. Rule 12(f) of the Federal Rules of Civil Procedure provides in its pertinent part: "(f) Motion to Strike. Upon motion made by a party * * * the court may order stricken from any pleading any insufficient defense * * *."

2. Rule 12(b) (1) of the Federal Rules of Civil Procedure provides in its pertinent part: "(b) How presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, * * * shall be asserted in the responsive pleading * * * except that the following defenses may * * * be made by motion: (1) lack of jurisdiction over the subject matter, * * *."

3. Rule 42(b) of the Federal Rules of Civil Procedure provides in its pertinent part: "(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice * * * may order a separate trial of any * * * counterclaim * * *."

4. Rule 6(b) of the Federal Rules of Civil Procedure provides in its pertinent part: "(b) Enlargement. When by these rules * * * an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) * * * order the period enlarged if request therefor is made before the expiration of the period originally prescribed * * *."

Defendants PARAMOUNT PICTURES CORPORATION and EMBASSY PICTURES CORPORATION have each filed separate answers and counterclaims. But, since the third defense and counterclaim of each of the defendants are essentially identical they will be treated herein as though they were presented jointly in one pleading.

## BACKGROUND

Plaintiffs instituted their action by a complaint for injunction and damages resulting from the alleged conspiracy of the defendants in violation of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

The alleged unlawful acts of the defendants arise out of the production and marketing of two motion pictures bearing the title "HARLOW." Plaintiffs allege that the defendants and others conspired to and engaged in a national campaign of boycott effectively foreclosing the free marketing of plaintiffs' motion picture "HARLOW."

5. Defendant Paramount Pictures Corporation alleges in its third defense:

*Third Defense*

"Plaintiffs and Electronovision Productions, Inc., a corporation organized and existing under the laws of New York, with its principal place of business in the City of Los Angeles, California, well knowing the previous plans of defendants to produce for release in the early summer of 1965 a major and expensive motion picture with the title "Harlow," based upon the life of Jean Harlow and with Carroll Baker assigned the leading role portraying Jean Harlow, combined, conspired and agreed to engage in unfair competition as follows:

(a) To finance, produce, and distribute to motion picture theatres in the United States, Canada and elsewhere, an inferior and quickly made Electronovision "Harlow";

(b) To release the Electronovision "Harlow" a short time in advance of the release of defendants' major and expensive motion picture "Harlow";

(c) To appropriate to themselves the effects of the large volume of pre-release publicity concerning defendants' "Harlow" which defendants at great time and expense had created;

(d) To confuse and mislead the motion picture-going public into believing

Defendants filed their answer contending that: (1) plaintiffs' complaint fails to state a claim upon which relief can be granted; (2) defendants did not conspire to, nor violate the antitrust laws, and (3) plaintiffs themselves are guilty of unfair competition and are barred for assertion of their claims as the result of their illegal conduct and unclean hands. Defendants also filed a counterclaim alleging unfair competition on the part of the plaintiffs and asking affirmative relief by way of damages. In their counterclaim defendants seek to name a new party ELECTRONOVISION PRODUCTIONS, INC. as part of the conspiracy therein alleged.

It is the third defense and counterclaim of defendants that primarily bring the parties before the court at this time.

## MOTION TO DISMISS THIRD DEFENSE [5]

It would appear from the arguments of counsel and the memoranda filed both in support and in opposition to the mo-

that the Electronovision "Harlow" was the motion picture "Harlow" which defendants had announced, publicized and upon which defendants had expended great time and expense in necessary preproduction arrangements;

(e) To refrain from taking reasonable steps to distinguish the Electronovision "Harlow" from defendants' production by title, leading lady, advertising, publicity and other characteristics;

(f) Unfairly to prejudice the success of defendants' motion picture "Harlow" by attempting to induce operators of motion picture theatres to exhibit the Electronovision "Harlow" before the general release of defendants' motion picture "Harlow";

(g) To attempt to intimidate and threaten operators of motion picture theatres into not exercising their independent business judgment to exhibit defendants' production of "Harlow" to the exclusion of the Electronovision "Harlow";

(h) To threaten operators of motion picture theatres with expensive lawsuits if they did not license and exhibit the Electronovision "Harlow" before exhibiting defendants' motion picture "Harlow";

(i) To attempt to prevent defendants and motion picture theatre opera-

tion here under discussion that the Supreme Court has clearly stated the law on the defense of unclean hands in antitrust litigation in the case of Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, (1951) 340 U.S. 211, at page 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 when it says:

"But the Sherman Act makes it an offense for respondents to agree among themselves to stop selling to particular customers. If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The *alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured.* Cf. Fashion Originators' Guild v. Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 242–243, 68 S.Ct. 996, 1009, 92 L.Ed. 1328." (emphasis added)

As obvious as the rule of the *Kiefer-Stewart* case (supra) may appear to be, it is not so simply dispositive of the consideration of the case before the court. This is particularly true in light of the interpretation given defendants third defense in defendants' memorandum. Nor can the matter be resolved by oversimplification with labels such as "boycott" and "unclean hands."

Defendants claim that the allegations of the third defense are necessary to allow proof of the reasonableness of their actions in light of the plaintiffs' conduct. Plaintiffs, without conceding the admis-

sibility of evidence to support the allegations of the third defense, claim that all relevant evidence of the reasonableness of the conduct on the part of defendants would be admissible under defendants general denial. But the concession is not so unequivocal as to make further consideration of the matter unnecessary.

In Times-Picayune v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) the Supreme Court describes the inquiry into reasonableness in this language at page 615, 73 S.Ct. at page 884:

" * * * For our inquiry to determine reasonableness under § 1 must focus on 'the percentage of business controlled, the strength of the remaining competition [and], *whether the action springs from business requirements or purpose to monopolize'. * * * *"* (emphasis added)

and at page 623, 73 S.Ct. at page 888 the court gives further indication of this inquiry when it says:

" * * * To be sure, an unlawful trade practice may not be justified as an emulation of another's illegal plan. Cf. Federal Trade Commission v. A. E. Staley Mfg. Co., 1945, 324 U.S. 746, 753–754, 65 S.Ct. 971, 974–975, 89 L.Ed. 1338. But that factor is certainly relevant to illuminate ambiguous intent, particularly when planned injury to that other competitor is the crux of the charge."

Plaintiff herein, in addition to alleging the "boycott" it claims as per se violations of the antitrust laws alleges acts to which the allegations of defendants'

tors from exercising their rights of free speech under the First Amendment to the Constitution of the United States of America with respect to comments upon plaintiffs' methods of doing business with respect to the Electronovision "Harlow";

(j) To engage in unfair and misleading advertising with respect to the Electronovision "Harlow"; and

(k) To attempt to use the antitrust laws of the United States and threats of litigation to force the Electrono-

vision "Harlow" upon operators of motion picture threatres and the public.

Plaintiffs did the things they combined, conspired and agreed to do to the damage and injury of defendants and said plaintiffs are barred by said illegal conduct and unclean hands from asserting the violations of law referred to in the complaint."

The allegations of Embassy Pictures Corporation are so substantially identical that repetition would serve no useful purpose.

third defense are peculiarly applicable. Plaintiff alleges: (1) that the defendants "conducted a deliberate, wilful and malicious campaign consisting of public statements, press releases, advertising, and private conversations, aimed directly at destroying and impairing the commercial value of Photoplay, and attacked the integrity of the management of plaintiffs"; (2) that defendants "threatened to destroy and discourage plaintiffs' future financing and distribution efforts by publicly stating that they would deliberately time the release of their future pictures to coincide with future releases of plaintiffs"; (3) that defendants "embarked upon a public relations and advertising campaign unprecedented in the history of the motion picture industry, timed to coincide with the national release of Photoplay, deliberately contrived to destroy and reduce the commercial and box office value of Photoplay." These are not allegations of boycott. The third defense may add evidence which might not be admissible under the general denial. United States ex rel. Rodriguez v. Weekly Publications, D.C. N.Y.1947, 74 F.Supp. 763.

■■■ There can be no doubt that claims of unfair competition or unclean hands do not constitute a defense to an antitrust action. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons (supra); Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540, certiorari denied 1952, 342 U.S. 902, 72 S.Ct. 920, 96 L.Ed. 675; Trebuhs Realty Co. v. News Syndicate Co., D.C.S.D.N.Y.1952, 107 F.Supp. 595; Interborough News Co. v. Curtis Pub. Co., D.C.S.D.N.Y.1952, 108 F.Supp. 768. If the third defense of defendants is offered to justify *illegal* conduct on their part it cannot stand. Neither should the defendants, because of unfortunate labeling, be foreclosed from showing that the acts which may be proved by the plaintiffs at the trial are not a boy-

cott or otherwise illegal restraint of trade but rather legal and necessary to maintain competition in the market place. The court is persuaded by the logic of Judge Walsh in Affiliated Music Enterprises, Inc. v. Sesac, Inc., et al., D.C.S.D.N.Y.1955) 17 F.R.D. 509 at page 512 when he says:

" * * * Where attempted proof of the subject matter alleged as a defense might be too remote for reception under a general denial, it is desirable that the defense be pleaded. The defendant protects itself from waiver. The plaintiff and the court gain by this greater specificity of defendant's pleading. Theirfeld v. Postman's Fifth Avenue Corp., D.C.S.D.N.Y.1941, 37 F.Supp. 958, 960; United States ex rel. Rodriguez v. Weekly Publications, Inc., D.C.S.D.N.Y.1947, 74 F.Supp. 763, 764. Cf. Chicago Great Western Ry. Co. v. Peeler, 8 Cir. 1944, 140 F.2d 865, 868."

In denying the motion to dismiss the third defense the court does however strike therein the word "unfair" at line 30, page 4 of the answer of defendant Paramount Pictures Corporation and at line 7, page 5 of the answer of Embassy Pictures Corporation. The court also strikes all of the language beginning at the last word "and" on line 22, page 6 and ending with the word "complaint" on line 25, page 6 of the answer of defendant Paramount Pictures Corporation. The same language being found in the answer of defendant Embassy Pictures Corporation beginning with the last word of line 30, page 6 and ending on line 3 page 7 it is likewise stricken.

Considering it in this manner we append to the third defense the appellation of the "defense of reasonableness."

### MOTION TO STRIKE COUNTERCLAIM [6]

Having determined the validity of the third defense as a "defense of reason-

6. Defendant Paramount Pictures Corporation alleges in its counterclaim:
*Counterclaim*
"1. Plaintiff, Magna Pictures Corporation, is a corporation, which Para-

mount alleges, on information and belief, is organized and existing under the laws of the State of Delaware.
2. Plaintiff, Magna Pictures Distribution Corporation, is a corporation

ableness" the court now considers the counterclaim of the defendants. This consideration involves the determination of three possible or alleged bases for jurisdiction: (1) diversity of citizenship; (2) a Lanham Act cause of action

organized and existing under the laws of the State of California.

3. Defendant, Paramount Pictures Corporation, is a corporation organized and existing under the laws of the State of New York.

4. Electronovision Productions, Inc. is a corporation organized and existing under the laws of the State of New York and transacts business within the State of California. It is joined as a counterdefendant pursuant to Rule 13(h) of the Federal Rules of Civil Procedure. Its joinder is required for the granting of complete relief.

5. The matter in controversy with respect to this counterclaim, exclusive of interest and costs, exceeds $10,000.

6. Plaintiffs and Electronovision Productions, Inc. at some time commencing in or about October, 1964, combined, conspired and agreed to engage in unfair competition with respect to defendants' projected release of a major and expensive motion picture based upon the life of Jean Harlow, which motion picture was set to be released in or about June of 1965.

7. The terms of said combination, conspiracy and agreement were as follows:

(a) To finance, produce, and distribute to motion picture theatres in the United States, Canada and elsewhere, an inferior and quickly made Electronovision "Harlow";

(b) To release the Electronovision "Harlow" a short time in advance of the release of defendants' major and expensive motion picture "Harlow";

(c) To appropriate to themselves the effects of the large volume of pre-release publicity concerning defendants' "Harlow" which defendants at great time and expense had created;

(d) To confuse and mislead the motion picture-going public into believing that the Electronovision "Harlow" was the motion picture "Harlow" which defendants had announced, publicized and upon which defendants had expended great time and expense in necessary preproduction arrangements;

(e) To refrain from taking reasonable steps to distinguish the Electronovision "Harlow" production from defendants' production by title, leading lady, advertising, publicity and other characteristics;

(f) Unfairly to prejudice the success of defendants' motion picture "Harlow" by attempting to induce operators of motion picture theatres to exhibit the Electronovision "Harlow" before the general release of defendants' motion picture "Harlow";

(g) To attempt to intimidate and threaten operators of motion picture theatres against exercising their independent business judgment to exhibit defendants' production of "Harlow" to the exclusion of the Electronovision "Harlow";

(h) To threaten operators of motion picture theatres with expensive lawsuits if they did not license and exhibit the Electronovision "Harlow" before exhibiting defendants' motion picture "Harlow";

(i) To attempt to prevent defendants and motion picture theatre operators from exercising their rights of free speech under the First Amendment to the Constitution of the United States of America with respect to comments upon counter-defendants' methods of doing business with respect to the Electronovision "Harlow";

(j) To engage in unfair and misleading advertising with respect to the Electronovision "Harlow"; and

(k) To attempt to use the antitrust laws of the United States and threats of litigation to force the Electronovision "Harlow" upon operators of motion picture theatres and the public.

8. Counterdefendants thereafter did the things they combined, conspired and agreed to do.

9. As a result of said combination, conspiracy and agreement, Paramount suffered serious and extensive damage in that it was obliged to expend extra sums of money for advertising to attempt to alleviate the confusion caused by plaintiffs' conduct and suffered and will suffer further damage in loss of film rentals caused as a result of the aforesaid acts of plaintiffs.

10. Paramount cannot now state precisely the amount of damages which it will sustain as a result of counterdefendants' unfair competition but believes that the amount of said damages will be in excess of $1,000,000 and prays leave to amend its counterclaim to state the amount of such damages when the continuing events contributing to such damages have ceased."

The allegations of the counterclaim of Embassy Pictures Corporation are so substantially identical that repetition would serve no useful purpose.

for unfair competition; and (3) ancillary jurisdiction of a compulsory counterclaim.

(1) Diversity of Citizenship.

Both parties concede the lack of independent jurisdiction of the cause of action alleged in defendants' counterclaim based upon diversity of citizenship.

(2) The claimed Lanham Act cause of action for unfair competition.

Defendants claim that this court has jurisdiction of their counterclaim by reason that the Lanham Act, 15 U.S.C.A. Sections 1051–1127 creates a Federal Cause of action in cases of unfair competition affecting interstate commerce. More specifically defendants rely on Title 15 U.S.C.A. Section 1126(b), (h) and (i).[7]

Plaintiffs would limit the provisions of the Lanham Act to protection of unfair competition pendent to a trade mark, trade name or commercial name. Most certainly plaintiffs' position describes the most direct protection of the Lanham Act. But Section 1126(b) and (h) of Title 15 provide protection to foreign nationals whose country has a convention or treaty with the United States relating to (b) "trademarks, trade or commercial names, *or the repression of unfair competition*" (emphasis added) and (h) "effective protection *against unfair competition*" (emphasis added). In Section 1126(i) Congress extended the same protection "against unfair competition" to "Citizens or residents of the United States". The court finds therein no requirement of a pendent trade mark, trade name or commercial name. It is reasonable to assume that the Congress was, in fact, creating a separate action of unfair competition in interstate and foreign commerce for the protection of foreign nationals. To require citizens to add the requirement of a pendent trade mark, trade name or commercial name in order to receive the same protection against unfair competition extended to foreign nationals finds no support in the language of subsection (i). The Ninth Circuit has so held in Staufer, et al. v. Exley, 184 F.2d 962, at page 965 (1950), Judge Orr speaking for the court says:

" * * * The ground of jurisdiction over the unfair competition alleged in the instant case is the exercise by Congress of its power to repress unfair competition which affects interstate commerce, through enactment of the Lanham Act and the granting of jurisdiction over actions arising under that Act in §§ 1137 and 1338(a) of Title 28. If the alleged unfair competition before us is purely local and did not affect interstate commerce, we then have to look for federal jurisdiction in § 1338(b) or in diversity of citizenship. But if the alleged unfair competition, though local in the sense that the defendant was transacting only intrastate business, nevertheless affected the plaintiffs' interstate business, the situation is otherwise."

If the *Staufer* case (supra) left any doubt, Pagliero v. Wallace China Co., 198

---

7. Title 15 Section 1126(b), (h) and (i) provide:

"(b) Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter."

"(h) Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition."

"(i) Citizens or residents of the United States shall have the same benefits as are granted by this section to persons in subsection (b) of this section."

F.2d 339 (9th Cir. 1952) and Neal v. Thomas Organ Co., 325 F.2d 978 (9th Cir. 1963) cert. denied 379 U.S. 828, 85 S.Ct. 55, 13 L.Ed.2d 37, have resolved any doubt in the matter.

In the *Pagliero* case (supra) the court says 198 F.2d at 341:

"* * * There is, however, an independent ground for federal jurisdiction in a case such as this involving, as it does, a 'naked' claim of unfair competition."

And in *Neal* (supra) the court says at 325 F.2d page 983:

"* * * In holding that under the Lanham Act (15 U.S.C.A. § 1126) there had been created a substantive federal law of unfair competition wherever interstate commerce was involved * * *."

The authorities to the contrary [8] are not convincing in light of a reading of the applicable subsections of § 1126. Nothing therein indicates the necessity of ownership of a trade mark, trade name or commercial name to invoke the remedy given in subsection (h) for "effective protection against unfair competition." The statute clearly gives the right of action—then provides—that the remedies shall be the same (where appropriate) as the remedies for infringement of trade marks, i. e., injunction and/or damages.

The interest of the Congress is clearly spelled out in Section 1127 of Title 15 providing an intent "to protect persons engaged in such commerce against unfair competition."

■ The increasing ease of commercial intercourse between the states of our nation compels this court to assert its jurisdiction over a "purely unfair competition" action. To relegate a plaintiff, where interstate commerce is involved, to actions in 50 separate jurisdictions to obtain complete relief from claimed acts of unfair competition would be a departure from substantial justice this court is unwilling to undertake. Until the conflict between our Circuit and the 2nd, 3rd and 5th Circuits is resolved this court will hold that Title 15, Section 1126(b), (h) and (i) creates a cause of action for unfair competition (which affects interstate commerce), independent of any other ground of federal jurisdiction over subject matter or person.

(3) Ancillary jurisdiction of the counterclaim.

A determination of ancillary jurisdiction in the counterclaim presented herein for consideration is whether or not it is permissive only or compulsory within the meaning of Rule 13(a) of the Federal Rules of Civil Procedure.

■ Federal Rules of Civil Procedure Rule 13(a) provides in its pertinent part:

"(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of this transaction or occurrence that is the subject matter of the opposing party's claim * * *."

The test for the compulsory nature of a counterclaim is succinctly stated in Barron and Holtzoff Vol. 1A, Section 394. The test is four-fold and requires that the claim must:

"(1) Arise 'out of the transaction or occurrence that is the subject matter of the opposing party's claim';

(2) be matured and owned by the pleader at the time he serves his pleading;

(3) not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction; and

8. Second Circuit: American Auto Association v. Spiegel (1953) 205 F.2d 771, cert. den. 346 U.S. 887, 98 L.Ed. 391, 74 S.Ct. 138; Maternally Yours, Inc. v. Your Maternity Shop, Inc. (1956) 2 Cir., 234 F.2d 538 (footnote 1 of opinion) Kaz Mfg. Co. v. Chesebrough-Ponds, Inc. (1962) D.C., 211 F.Supp. 815, (footnote 23 of opinion) [Affd. 317 F.2d 679].

Third Circuit: L'Aiglon Apparel, Inc. v. Lana Lubell, Inc. (1954) 3 Cir., 214 F.2d 649.

Fifth Circuit: Royal Lace Paper Works, Inc. v. Pest-Guard Products Inc. (1957) 240 F.2d 814.

(4) not have been, at the time the original action was commenced, the subject of another pending action."

There is no question in the instant case of the existence of tests (2), (3), and (4). We here are concerned only with the dispute as to the existence of subject matter which arises out of the transaction or occurrence which is the subject matter of plaintiff's claim.

Plaintiff brought this action alleging violation of the antitrust laws on the part of the defendants and would have us limit our inquiry into the "transaction or occurrence" to the limited issue. But the acts complained of by plaintiffs are those alleged acts of defendants which were committed in the connection with the marketing of defendants' production HARLOW in competition with plaintiffs' production HARLOW. Defendants' counterclaim complains of, among other things, those alleged acts of plaintiffs which were committed in connection with the marketing of plaintiffs' production HARLOW in competition with defendants' production HARLOW.

In defining "transaction" the Supreme Court gives it broad application in Moore v. N. Y. Cotton Exchange (1926) 270 U.S. 593, saying at page 610, 46 S.Ct. 367, at page 371, 70 L.Ed. 750:

" 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. * * * That they are not precisely identical, or that the counterclaim embraces additional allegations, * * * does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim * * * "

■■ In following, the "logical relationship" concept of the *Moore* case (supra) the courts have given liberal and broad construction to claims and counterclaims to determine whether they "arise out of the same transaction or occurrence." Union Paving Company v. Downer Corporation (9th Cir. 1960) 276 F.2d 468. See also, United Artists Corp. v. Masterpiece Productions (2 Cir. 1955) 221 F.2d 213, Lesnik v. Public Industrials Corporation (2 Cir. 1944) 144 F.2d 968, E. J. Korvette Co. v. Parker Pen Co. (D.C.N.Y.1955) 17 F.R.D. 267, S. P. A. Ricordi Officine Grafiche v. World Art Reproductions Co. (D.C.N.Y.1958) 22 F.R.D. 312. Plaintiffs rightly describe antitrust litigation as "one of the most complex species of litigation." But complexity cannot destroy logical relationship so as to relegate antitrust litigation to the sacred and awesome position of requiring the singular attention of judge or jury. The logical relationship of the claim and counterclaim is so clearly evident here that broad or liberal interpretation is largely a luxury of consideration and not decision.

The motion to dismiss defendants' counterclaim is denied.

If this be a pioneer effort to bring into direct focus and to clarify the position of purely unfair competition actions in a nation which will shortly be spanned in commercial intercourse in less than two hours then the court welcomes the opportunity. The tools to bring order to what now appears to be chaos are available. We need only the clarification of the Supreme Court to resolve the conflict between the circuits for full utilization of those tools.

With development of mass media capable of making one competitive act so universal, those who compete in a national or international market deserve to know with uniformity which of those acts will be termed "unfair."

### MOTION FOR SEPARATE TRIAL OF COUNTERCLAIMS

■ The consideration of separate trials is governed by Federal Rules of Civil Procedure Rules 42(b). Having determined that the third defense may stand and that the counterclaim is proper under the theories herein set forth

the court does not at this stage of the proceedings find that separate trial of the counterclaim will either further convenience, avoid prejudice or be conducive to expedition and economy. The motion is denied without prejudice to plaintiffs to renew the motion when any of the grounds therefor become more evident than they now appear.

## MOTION FOR AN ENLARGEMENT OF TIME TO MOVE OR PLEAD TO COUNTERCLAIM

The motion is granted and plaintiffs shall have until and including March 20, 1967, within which to move or otherwise plead to the counterclaims of the defendants.